**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

MATTHEW MADDOX, *et al.*,

      Plaintiffs,

    v.

SASHA ADLER, *et al.*,

      Defendants.

Case No. 2:23-cv-00535-RFB-NJK

**ORDER**

Before the Court is the renewed Motion to Dismiss (ECF No. 43) of Defendant Sasha Adler Design, LLC ("SAD"), and Sasha Adler. For the reasons below, the Court grants the motion in part and denies the motion in part.

## I.   PROCEDURAL BACKGROUND

On March 3, 2023, Plaintiffs Matthew Maddox and Katherine Maddox (collectively the Maddoxes) filed the original Complaint in the Eighth Judicial District Court of Clark County, Nevada. ECF No. 1. The Maddoxes complained that various actions by Defendants arising out of a home renovation project violated the Deceptive Trade Practices Act ("NDTPA") codified at Nevada Revised Statutes ("NRS") § 598.0903 *et seq.* ECF No. 1. Defendants removed the case to this Court on April 10, 2023. Id. On January 11, 2024, the Court determined that Plaintiffs allegations sounded in fraud, dismissed the original Complaint as insufficiently pled, and gave Plaintiffs leave to amend. ECF No. 36. On January 25, 2024, Plaintiffs filed the First Amended Complaint ("FAC") alleging six causes of action under the NDTPA. ECF No. 37. Defendants filed the instant Motion to Dismiss on February 22, 2024. ECF No. 43. The motion is fully briefed. ECF Nos. 43, 50, 54. The Court's Order follows.

## II.     FACTUAL ALLEGATIONS

The following allegations are taken from the FAC.

In April 2020, the Maddoxes signed a contract ("the Contract") with SAD to renovate their home in Las Vegas, Nevada ("the Property"). The Maddoxes selected Adler and SAD's services because Defendants held themselves out as having the relevant knowledge and skills to perform interior design services. During the execution of the Contract, Defendants made several misrepresentations, omissions, or false statements. The result was delay, additional expenditures, and wrongful enrichment. The Maddoxes ultimately paid more than $2.2 million. Broadly, the Maddoxes complain of issues related to (1) licensure, (2) the items promised and received, and (3) the costs. Each are discussed in turn.

### a.  Licensure

Defendants led the Maddoxes to believe that they possessed the requisite licenses and approvals to complete the work and provide interior services in Nevada. Defendants led Plaintiffs to believe they were qualified and had the competency to design a new kitchen for Plaintiffs. From April through July 2022, a general contractor worked directly with SAD employee Hector Albizures to carry out Defendants' kitchen design. Mr. Albizures incorrectly stated the measurements for the countertops and butcher block to the contractor. Consequently, the design for the kitchen did not follow the design represented to Plaintiffs. Sasha Adler agreed to fix the problems at no cost. However, Plaintiffs were charged additional design fees for the re-design. In addition, Defendants led the Maddoxes to believe they were qualified and had the competency to create a design for a fireplace. Defendants' plan was ultimately impossible to implement due to incorrect measurements. Plaintiffs also purchased a mantel for the fireplace which did not fit as represented because it was also incorrectly measured. Plaintiffs incurred $15,520.81 in damages for the faulty design work.

### b.  Unapproved, Damaged, and Nonexistent Items

Defendants proposed certain goods to be approved by Plaintiffs. The Maddoxes approved items with certain specifications. In numerous instances, Defendants (1) unilaterally and secretly changed the item without Plaintiffs' knowledge or consent, (2) knowingly delivered damaged,

defective, and/or broken items, or (3) advertised the item with the knowledge it could not be produced or delivered. As a result, Defendants profited from Plaintiffs' assent to their deceptive representations. Plaintiffs identify fifteen such items:[1]

1. **Custom Mohair Family Room Rug**. On June 11, 2021, Plaintiffs approved Defendants' proposal for the purchase of a custom, tan, 14' x 17' rug for $25,447.37. The rug delivered was not tan, and three feet shorter in length than Plaintiffs specified. Defendants refused to refund and offered to fix the rug by adding a panel. The final cost to Plaintiffs for the rug was $35,017.63.

2. **Custom Woven Alpaca Bedroom Entry Rug**. On March 9, 2022, Plaintiffs approved Defendants' proposal for the purchase of a custom, 4' x 7' entryway rug for $3,609.99. The rug delivered was one foot shorter than represented by Defendants. Sasha Adler admitted to changing the size and that she did not disclose the change to Plaintiffs. Defendants did not offer a refund and the size was not corrected.

3. **Antique Office Desk**. On August 13, 2021, Plaintiffs approved Defendants' proposal for the purchase of an antique office desk for $74,422.69. Defendants showed Plaintiffs a photograph of the desk which was not damaged and had no scratches. The desk was delivered with new scratches across the surface. Defendants represented they would fix the desk, but later refused to refund or correct the problem.

4. **Fireplace Screen**. On March 29, 2022, Plaintiffs approved Defendants' proposal for the purchase of a fireplace screen comprised of glass with brass detail for $3,822.39. The item delivered was not the correct size and did not have brass detailing. Defendants never disclosed the change in item before it was delivered to Plaintiffs' home. The final cost for the incorrect screen was $7,056.78.

5. **Drapery**. On April 16, 2022, Plaintiffs approved Defendants' proposal for the purchase of custom drapes for $31,583.95. Plaintiffs requested the drapes to be inoperable with a 12" fold over of fabric. SAD employee Hector Albizures represented that Defendants could satisfy Plaintiffs' requests. The drapes delivered were operable and did not have the 12" fold over. Sasha Adler admitted that she unilaterally overruled Plaintiffs' request, stating inoperable drapes "would not look full enough." The change to the approved item was never discussed with Plaintiffs.

6. **Tension Floor Lamp**. On April 21, 2021, Plaintiffs approved Defendants' proposal for the purchase of a custom handing floor lamp for $21,100.71. Defendants represented that the lamp would fit in its intended space. Plaintiffs later requested to cancel the lamp because it did not fit the space Defendants represented. Defendants claimed the lamp was already "in production" and could not be refunded. One year later, Defendants admitted to Plaintiffs that the lamp was not in production.

---

[1] For simplicity, the Court will refer to items in this section throughout the Order using the following form: (item, number, *supra*). For example, (item, #5 *supra*) refers to the drapery.

7. **Modular Outdoor Sofa**. On June 16, 2021, Plaintiffs approved Defendants' proposal for the purchase of an outdoor couch for $46,891.15 and an additional $5,901.46 for custom fabric. The delivered sofa was materially different than what was represented to Plaintiffs. Ms. Adler admitted that she unilaterally changed the filling in the sofa to be waterproof. Defendants did not refund Plaintiffs.

8. **Bathroom Vanity**. On August 13, 2021, Plaintiffs approved Defendants' proposal for the purchase of a royal blue, 32" bathroom vanity for $11,682.55. Plaintiffs requested the vanity to be one inch above standard height. SAD employee Hector Albizures confirmed the request and represented Defendants would comply with it. The vanity delivered was noticeably shorter and the wrong color. When asked about the discrepancy, Mr. Albizures said that the proposal photo from Defendants was a vanity "at our former client's home, so the color won't be an exact match" and that "the original vanity in person is much lighter than what is represented in the photo." Defendants did not refund Plaintiffs or fix the color.

9. **Rounded Corner Sofa with Pleated Skirt**. On March 10, 2021, Plaintiffs approved Defendants' proposal for the purchase of a rounded corner sofa with pleated skirt and fabric upholstery for the price of $23,767.02. Defendants represented that the pleated skirt would be uniform and touch the floor. The sofa did not come as represented, for the upholstery was incorrect, the fabric was uneven in several spots, and the skirt raised off the floor by three inches.

10. **Neoclassical French Bleached Oak Armoire**. On June 11, 2021, Plaintiffs approved Defendants' proposal for the purchase of an armoire for $11,710.41. Plaintiffs stated they did not want the top of the armoire taken off. When the item was delivered, the top was off.

11. **Ottomans**. On June 16, 2021, Plaintiffs approved Defendants' proposal for the purchase of two turquoise ottomans for $1,528. The ottomans were delivered brown, not turquoise. When asked, Sasha Adler claimed that the ottoman in the represented image was not available because it was discontinued by the vendor. Defendants refused to refund the items.

12. **Bespoke Travertine Table**. On June 16, 2021, Plaintiffs approved Defendants' proposal for the purchase of a travertine table for $7,231.92. The table delivered was not the height represented by Defendants. Defendants attempted to mitigate this error by ordering a new base for the table, which ultimately did not fit the tabletop. As a result, the table is unusable. Defendants have not issued a refund or corrected the table.

13. **Flower Sculpture**. On March 10, 2021, Plaintiffs approved Defendants' proposal for the purchase of a flower sculpture for $15,091.22. The sculpture delivered did not have floral or butterfly characteristics Defendants represented. Plaintiffs returned the sculpture to Defendants, but Defendants did not issue a refund.

14. **French End Chairs**. Plaintiffs purchased a pair of French end chairs from Defendants. When delivered, the chairs did not match the height specifications represented by Defendants by several inches in height. Additionally, the upholstery did not meet the approved and represented characteristics.

Defendants have not refunded or offered to correct the problems.

15. **Kitchen Table Chairs**. Plaintiffs purchased five kitchen table chairs from Plaintiffs for $20,651.29. The chairs were not the height represented by Defendants. Sasha Adler said she would have the chairs remade at the height represented and approved by Plaintiffs. Defendants ultimately charged Plaintiffs $22,362.18 for the chairs and $846.72 for upholstery. To date, Defendants have not corrected the chairs nor refunded Plaintiffs.

### c. Instances of Costs, Credits, and Mark-up

Plaintiffs allege that in April 2020, Defendants represented that their pricing and costs would be completely transparent throughout the project. For example, Defendants represented they would provide Plaintiffs "a line-item budget for all purchases." In contrast, Plaintiffs were wrongly charged in several instances:[2]

1. **Unapproved Charges on Items.** There were unapproved price increases without notice or transparency from Defendants. The antique desk (item #3 *supra*) was represented to Plaintiffs with a price of $74,422.69. Plaintiffs were billed $79,401. Plaintiffs allege that the vendor price of the tension floor lamp (item #6 *supra*) was $15,760, yet Defendants billed $21,100.71. The travertine table (item #12 *supra*) was represented to Plaintiffs with a price of $7,231.92. Plaintiffs were billed $8,301. The French end chairs (item #14 *supra*) were represented to Plaintiffs with a price of $5,707.99. Plaintiffs were billed $7,583.97. The kitchen table chairs (item #15 *supra*) were represented to Plaintiffs with a price of $20,651.29. Plaintiffs were billed $22,362.18.

2. **Inflated Shipping Costs and Tax Charges**. Plaintiffs allege the fireplace screen (item #3 *supra*) doubled in price because of shipping cost because of "delicate glass" and "special crating," according to Defendants. When Plaintiffs told Defendants that a local store had a similar screen and could deliver it cheaply, Defendants' invoice was retroactively changed to near half of the previous shipping cost. Defendants also charged sales tax on the freight, which is not taxed in the state of Nevada. Defendants' vendor documentation establishes that no sales tax was taxed on freight. Additionally, Defendants charged Plaintiffs for sales tax and freight of a pair of sconces, items which were never delivered. The sales tax of the corner sofa (item #9 *supra*) inflated from $1,990.49 in 2021 to $2,397.51 in 2023 for the same item.

3. **Credit System**. Rather than providing Plaintiffs refunds for unapproved, damaged, or missing items, Defendants would offer "credits" that Plaintiffs could use to discount other SAD items. Defendants never actually applied any of these credits to any discount. Defendants provided these credits so Sasha Adler could wrongfully keep unearned fees and commissions. A total of 31 items amount to more than $239,000 in credits. Defendants were required by

---

[2] Similarly, the Court will refer to this section elsewhere in the Order using the following form: (instances, number, *supra*). For example, (instances, #4 *supra*) refers to the 35% mark-up.

law to return the money to Plaintiffs. Defendants admit to withholding over $69,000 of Plaintiffs' funds and claim to return the money only in exchange for a liability waiver.

4.   **35% Mark-Up**. Defendants charged Plaintiffs a 35% mark-up on all goods and services without producing a line-item budget, as Defendants represented they would, so that Plaintiffs could confirm the fees were accurate.

5.   **Billed Time**. Defendants fraudulently charged exorbitant hourly fees of more than $459,900 for purported design time, including billing time spent returning unapproved items. On October 27, 2023, Plaintiffs asked Sasha Adler to identify the design time dedicated to design, sourcing, and fixing misrepresented items. Defendant Adler responded she could not provide the information because Defendants do not bill their time "by item." Defendants refuse to provide documentation verifying their time. Defendants appear to have fraudulently billed time. For example, in August 2022 Defendants conducted their install of various items, yet after the install Defendants billed Plaintiffs $40,000 "when the only substantive work being done was cleaning up all of Defendants' defective work."

### III.   LEGAL STANDARD

An initial pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In ruling on a motion to dismiss, "[a]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." Faulkner v. APT Sec. Services, Inc., 706 F.3d 1017, 1019 (9th Cir. 2013) (citations omitted).

To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must do more than assert "labels and conclusions" or "a formulaic recitation of the elements of a cause of action. . . ." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, a claim will not be dismissed if it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning that the court can reasonably infer "that the defendant is liable for the misconduct alleged." Id. at 678 (internal quotation and citation omitted). The Ninth Circuit, in elaborating on the pleading standard described in Twombly and Iqbal, has held that for a complaint to survive dismissal, the plaintiff must allege non-conclusory facts that, together with reasonable inferences from those facts, are "plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S.

Secret Service, 572 F.3d 962, 969 (9th Cir. 2009).

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To meet the particularity requirement of Rule 9(b), the complaint must identify the "who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." Salameh v. Tarsadia Hotel, 726 F.3d 1124, 1133 (9th Cir. 2013) (quoting Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011)).

## IV.   DISCUSSION

The Court now turns to the merits of the motion. Defendants argue that dismissal is warranted for three reasons: (1) this action is subject to arbitration; (2) the Contract requires the application of Illinois not Nevada law; (3) the FAC is insufficiently pleaded. In addition, Defendants request the Court strike or dismiss Plaintiffs' request for punitive damages. Plaintiffs contest each argument. The Court considers each in turn and, for the following reasons, the motion will be granted in part and denied in part.

### a.   Arbitration

The Court begins with the issue of arbitration. The Federal Arbitration Act ("FAA") provides that a "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985). The FAA limits the district court's role to determining (1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement to arbitrate encompasses the claims at issue. Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1175 (9th Cir. 2014). "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of

arbitrable issues should be resolved in favor of arbitration[.]" Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24-25 (1983). Thus, "[t]he standard for demonstrating arbitrability is not a high one; in fact, a district court has little discretion to deny an arbitration motion, since the Act is phrased in mandatory terms." Republic of Nicar. v. Std. Fruit Co., 937 F.2d 469, 475 (9th Cir. 1991). However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T Technologies, Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986) (quoting United Steelworkers of Am. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582 (1960)) ("AT&T").

The determination of whether a particular issue should be determined by the arbitrator rather than the court is governed by federal law. Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000). However, when deciding whether the parties agreed to arbitrate a certain matter, courts generally apply ordinary state law principles of contract interpretation. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). Section 3 of the FAA provides for a stay of legal proceedings whenever the issues in a case are within the reach of an arbitration provision. 9 U.S.C. § 3. Although the statutory language supports a mandatory stay, the Ninth Circuit has interpreted this provision to allow a district court to dismiss the action. See Sparling v. Hoffman Constr. Co., 864 F.2d 635, 638 (9th Cir. 1988).

Defendants raise three arguments relating to the arbitrability of the action: (1) the Contract delegates the issue of arbitrability to an arbitrator, if not, (2) Plaintiffs' claims fall within the scope of the arbitration agreement and (3) Plaintiffs' jury demand requires construction of the Contract and thus requires arbitration. The Court rejects the first two arguments but agrees with Defendants that Plaintiff's waived their right to a jury trial, however that that issue is not subject to arbitration.

### i. *Arbitration: Delegation*

The Court starts its analysis by looking to the Contract. The Contract contains an arbitration clause ("the Arbitration Provision"), which provides:

> The parties will attempt to resolve any disputes in good faith within thirty (30) days of written notice by either party of a dispute (the "Good Faith Period"). The parties agree that any dispute arising as to the parties' rights and obligations hereunder not resolved pursuant to the preceding sentence will be resolved by binding arbitration before a private arbitrator to be determined by the parties by mutually agreeable

> means within thirty (30) days after the Good Faith Period, or if the parties fail so to agree within a subsequent fifteen (15) days, then before an arbitrator in Chicago, Illinois in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect.

Defendants argue first that the Arbitration Provision also includes an agreement for the arbitrator to rule on the threshold issue of the arbitrability of any claims. Defendants point to the incorporation of the Commercial Arbitration Rules of the American Arbitration Association ("AAA") and that the AAA rules include a delegation clause. Plaintiffs counter that the Arbitration Provision makes no clear provision for delegating the determination of arbitrability to an arbitrator.

Under the FAA a court determines the threshold issues of whether the parties agreed to arbitrate and, if so, whether that provision encompasses the claims at issue. Nguyen, 763 F.3d at 1175. However, parties may "clearly and unmistakably" provide in the arbitration provision that those threshold issues themselves be determined by the arbitrator. AT&T, 475 U.S. at 649. Defendants' argument relies on the Ninth Circuit's decision in Brennan v. Opus Bank, where they held that "incorporation of the AAA rules [into an arbitration provision] constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." 796 F.3d 1125, 1130 (9th Cir. 2015). However, the Opus Bank court limited its holding to sophisticated parties. Id. at 1130-31 ("[W]e limit our holding to the facts of the present case, which do involve an arbitration [provision] between sophisticated parties."). While Defendants dispute that Plaintiffs are unsophisticated, they do not offer any reason as to why the Maddoxes' should have understood that the incorporation of the AAA rules delegates questions of arbitrability to the arbitrator. See Oracle America, Inc. v. Myriad Group A.G., 724 F.3d 1069, 1075 (holding that, in a contract between software companies, "as long as an arbitration [provision] is between sophisticated parties to commercial contracts, those parties shall be expected to understand that incorporation of [rules of arbitration] delegates questions of arbitrability to the arbitrator."). The Court does not find any reason to suggest Plaintiffs are sophisticated parties.

Further, in Shivkov v. Artex Risk Sols., Inc., the Ninth Circuit considered a clause that provided "first for mediation, second for arbitration by an arbitrator selected by the parties, and, only if the parties cannot agree on an arbitrator, arbitration before the AAA" and explained "[w]e

1    cannot find clear and unmistakable evidence that the parties intended to delegate the gateway issue

2    of class arbitration to the arbitrator by virtue of the AAA Rules when arbitration before the AAA

3    is the final option in the dispute procedure that the Clause outlines." 974 F.4th 1051, 1068-69 (9th

4    Cir. 2020). Here, the Arbitration Provision includes a similar three-step system for dispute

5    resolution. Therefore, the Court finds that the Parties did not clearly and unmistakably provide for

6    the arbitrator to handle the threshold issue of arbitrability.

7                                     **ii.  *Arbitration: Scope***

8            Under the FAA, the Court now determines the threshold issues of whether the Parties

9    agreed to arbitrate and, if so, whether that provision encompasses the claims at issue. That there

10   was an arbitration provision is undisputed. Defendants argue that Plaintiffs' six NDTPA claims

11   fall within the scope of the arbitration provision. Plaintiffs counter that the specific NDTPA

12   violations are statutory wrongs independent from any breach of contract.

13           The Supreme Court has held that arbitration is "strictly a matter of consent . . . , and thus

14   'is a way to resolve those disputes – *but only those disputes* – that the parties have agreed to submit

15   to arbitration." Granite rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 299 (2010) (emphasis

16   original) (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995)). Here,

17   looking to the specific language of the Arbitration Provision, the Parties agreed to resolve "any

18   dispute arising as to the parties' rights and obligations hereunder. . . [.]" The Court finds the plain

19   meaning of the language of the Arbitration Provision limits its applicability to disputes arising

20   under the contract. See Hereunder, Black's Law Dictionary (12th ed. 2024) ("In accordance with

21   this document."). The Ninth Circuit has held the same. See Mediterranean Enterprises v.

22   Ssangyong Corp., 708 F.2d 1458, 1464 (9th Cir. 1983) (holding "'arising hereunder' is intended

23   to cover a [narrow] scope of disputes, *i.e.*, only those relating to the interpretation and performance

24   of the contract itself.").

25           In Tracer Research Corp. v. Nat'l Envtl. Servs. Co., the Ninth Circuit concluded that

26   because plaintiff's tort claim "constituted an independent wrong from any breach of the licensing

27   and nondisclosure agreements[,] . . . it does not require interpretation of the contract and is not

28   arbitrable[.]" 647 F.3d 914, 922 (citations omitted). The Court looks to Plaintiffs' claims to

determine whether they relate to the interpretation and performance of the contract, *i.e.*, if Plaintiffs' claims constitute a wrong independent of the Contract. Plaintiffs bring six claims under the NDTPA. See Nev. Rev. Stat. §§ 598.0195-0925. NRS 41.600 provides for a private action by a person who is a victim of deceptive trade practices. That section states that "[a]ny action brought pursuant to this section is not an action upon any contract underlying the original transaction." Nev. Rev. Stat. 41.600(4). In agreement with the statute, the Court finds here that Plaintiffs' claims, rather than requiring interpretations of the Contract, explicitly emerge from misrepresentations and omissions made by Defendants throughout their course of business.

While "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[,]" Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T, 475 U.S. at 648. Therefore, the Court finds that the plain language of the Arbitration Provision, in conjunction with NRS 41.600, excludes Plaintiffs' claims under the NDTA from the scope of arbitration.

### iii. *Arbitration: Jury Demand*

Finally, Defendants argue Plaintiffs agreed to waive their right to a jury trial in the Contract. Further, they argue that interpreting this jury waiver requires construction of the contract, and, therefore, the matter must be dismissed in favor or arbitration. Plaintiffs counter that their claims have no basis in the Contract and thus not subject to arbitration.

Plaintiffs have a constitutional right to a jury trial. See U.S. Const. amend. VII. The Ninth Circuit has determined that the law concerning pre-dispute jury trial waivers is procedural under Erie R. Co. v. Tompkins, 304 U.S. 64 (1938), and governed by federal law to determine their validity. County of Orange v. United States Dist. Court, 784 F.3d 520, 524-25, 531-32 (9th Cir. 2015). In addition, federal courts are required to "import, as the federal rule, state law governing jury trial waivers where . . . state law is even more protective." Id. at 525, 532. This requires looking to the choice of law provision in the contract. See id. Under federal law, parties may contractually waive their right to a civil jury trial if the waiver is "made knowingly and voluntarily." Palmer v. Valdez, 560 F.3d 965, 968 (9th Cir. 2009). In Illinois, "a party to an agreement is charged with knowledge of and assent to the agreement signed" and jury rights may

be waived as a result. See Melena v. Anheuser-Busch, Inc., 847 N.E. 2d 99, 108 (Ill. 2006).

The Court also finds that Plaintiffs have waived their jury right. As a threshold matter, by its terms, the Arbitration Provision applies only to "disputes" relating to the performance of the Contract and not all disputes between the parties. The Contract, however, provides that "[e]ach of the parties irrevocably waives any right to trial by jury in *any action, proceeding, or counterclaim, whether at law or in equity, brought by any of such parties*." (emphasis added). If the words in the contract are clear and unambiguous, under Illinois law they must be given their plain, ordinary, and popular meaning. Central Illinois Light Co. v. Home Insurance Co., 821 N.E.2d 206, 213 (Ill. 2004). The Court finds the plain meaning of the Contract is clear. The Parties waived jury rights in all possible proceedings between themselves, not just disputes arising under the Contract. Further, there is no dispute that the Contract was knowingly and voluntarily made. See also Melena, 847 N.E. 2d at 106-07 (explaining a signed contract is proof of such). Therefore, the Court will enforce that waiver here. If this action proceeds to trial, it will be conducted as a bench trial.

### b.  Choice of Laws

Defendants also argue that Illinois law, not Nevada law, must apply to Plaintiffs' claims, based upon the Arbitration Provision. Plaintiffs once again counter that their claims are not based upon nor subject to the Contract. The choice of law provision in the Contract states: "[t]his [contract] will be deemed made in Illinois and will be governed by the laws of the State of Illinois without regard to its choice of law provisions." The Court agrees with Plaintiffs and has already found that Plaintiffs' NDTPA claims are stand-alone Nevada claims.

### c.  Sufficiency of Plaintiffs' Pleadings

The Court now looks to the pleadings to determine whether they are sufficiently alleged. The NDTPA provides a private cause of action for "any person who is a victim of consumer fraud." Nev. Rev. Stat. § 41.600 "Consumer fraud" is defined as any "deceptive trade practice" as defined in NRS 598.0915 to 598.0925. To plead a NDTPA claim, a plaintiff must plead (1) an act of consumer fraud by the defendant (2) caused (3) damage to the plaintiff. See Picus v. Wal-Mart Stores, Inc., 256 F.R.D. 651, 658 (D. Nev. 2009). The Parties' dispute centers on the first element—whether the statutory definitions of consumer fraud are met—and whether those

1   elements are subject to the heightened fraud pleading standards of Federal Rule of Civil Procedure

2   9(b). The Court reviews each claim in turn.

3            **i.   *Claim 1 – NRS 598.0923(1)(a), (c)***

4         Plaintiffs' first claim relates to licensure. They present two theories that a lack of licenses

5   is a deceptive trade practice under the definitions in NRS § 598.0923. Section (1)(a) provides that

6   a person engages in a deceptive trade practice when in the course of their business they knowingly

7   conduct that business without all required state, county or city licenses. Nev. Rev. Stat. §

8   598.0923(1)(a). Similarly, § (1)(c) makes knowingly violating a state or federal statute or

9   regulation relating to the sale or lease of goods or services a deceptive trade practice. Nev. Rev.

10  Stat. § 598.0923(1)(c). In a detailed, published opinion, the Nevada Court of Appeals explained

11  that within the NDTPA the term knowingly "does not require that the defendant intend to deceive

12  with the act or omission, or even know of the prohibition against the act or omission, but simply

13  that the defendant is aware that the facts exist that constitute the act or omission." Poole v. Nev.

14  Auto Dealership Invs., LLC, 449 P.3d 479, 483 (Nev. Ct. App. 2019).

15        Plaintiffs allege that Defendants were required to obtain licensing under NRS 623.0225,

16  which provides "no person may practice . . . residential design or use the title of registered interior

17  designer. . . in this State without having a certificate of registration issued to him or her pursuant

18  to the provisions of this chapter." The FAC also cites to provisions of the Nevada Admin Code.

19  See Nev. Admin. Code §§ 623.865, 880.

20        First, the Court finds these provisions are not subject to the heightened 9(b) pleading

21  standard. These sections only prohibit knowingly conducting a business without a license as well

22  as knowingly violating a state statute in the course of business. Violation of these subsections of

23  the NDTPA does not require any alleged misrepresentation or concealment of a material fact. See

24  Fed. R. Civ. P. 9(b); see also Fraud, Black's Law Dictionary (12th ed. 2024) ("[a] knowing

25  misrepresentation or knowing concealment of a material fact made to induce another to act to his

26  or her detriment.").[3] Therefore, the claim does not sound in fraud and is not subject to the

27

28      [3] While it is true that a claim may sound in fraud even where the elements do not require showing fraud, Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103 (9th Cir. 2003), the allegations of fraud for Claim 1 do not "support" the actual violation and so the 9(b) particularity

heightened standard of Rule 9(b). See also Plaintiffs v. MGM Resorts Int'l, 638 F. Supp. 3d 1175, 1199 (D. Nev. 2022) (concluding the same regarding § (1)(c)).

Second, the Court finds the claim is sufficiently pleaded. Plaintiffs allege that Defendants led them to believe that they possessed all the necessary licenses to work in Nevada but carried out the renovation without those licenses, damaging Plaintiffs' property in excess of $75,000. Specifically, Plaintiffs allege that the damages to the fireplace and kitchen designs were the result of Defendants' failure to be properly licensed in the state. In doing so, Defendants violated Nevada law. See Nev. Admin. Code §§ 623.865, 880.

Defendants argue that Nevada only requires "licensed" interior designers to be registered with the state and that Plaintiffs failed to include an allegation Defendants represented themselves as licensed interior designers. The Court disagrees for two reasons. Sections 1(a) and 1(c) do not require that a defendant hold themselves out as licensed, only that they knowingly conduct business without required licensure. In addition, the FAC states that Defendants violated a Nevada law concerning licensed interior designers. The Court finds that is sufficient at this stage to carry their burden.[4] Therefore, Claim 1 may proceed under both theories.

### ii.   *Claim 2 – NRS 598.0923(1)(b), (e)*

Claim 2 concerns alleged failures to disclose. Plaintiffs present two theories of liability under the definitions provided in NRS 598.0923. Section 1(b) makes it a deceptive trade practice to knowingly fail to disclose a material fact in connection with the sale or lease of goods or services. Nev. Rev. Stat. § 598.0923(1)(b). Section 1(e) makes it a violation to knowingly use an "unconscionable practice" in a transaction. Nev. Rev. Stat. § 598.0923(1)(e).

First, the Court finds both § 1(b) and 1(e) sound in fraud. Plaintiffs rely on the same theory for both sections: that, despite representing that a line-item budget would be provided, Defendants knowingly withheld information, inflated costs and fees, and fraudulently added expenses. See

---

requirement does not apply, see id. at 1104 ("[A] plaintiff may choose not to allege a unified course of fraudulent conduct in support of a claim, but rather to allege some fraudulent and some non-fraudulent conduct. In such cases, only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements.").

[4] The Court notes that whether Defendants are even subject to these requirements as licensed interior designers is better resolved following discovery at summary judgement.

1    Fraud <u>Black's Law Dictionary</u> (12th ed. 2024) ("[a] knowing misrepresentation or knowing

2    concealment of a material fact made to induce another to act to his or her detriment."); <u>see also</u>

3    <u>Plaintiffs</u>, 638 F. Supp. 3d at 1199 (concluding § 1(b) sounds in fraud).

4         Second, the Court finds that Plaintiffs have properly pleaded both the § 1(b) and 1(e)

5    theories. Rule 9(b) "only requires the identification of the circumstances constituting fraud so that

6    the defendant can prepare an adequate answer from the allegations." <u>Walling v. Beverly</u>

7    <u>Enterprises</u>, 476 F.2d 393, 397 (9th Cir. 1973). First, Plaintiffs properly plead the specific

8    circumstances regarding omission of certain fees and costs, *e.g.*, specific allegations concerning

9    inflated taxes and fees (instance #2 *supra*) and mischarging of time-billing (instance #5 *supra*).

10   Second, Plaintiffs cite ample specific circumstances where Defendants failed to disclose damages

11   or changes to items approves, *e.g.*, bespoke rugs (items #1, 2 *supra*), an antique desk (item #3

12   *supra*), various seating (items #7, 9, 11 *supra*), a vanity (item #8 *supra*), an armoire (item #10

13   *supra*), and miscellaneous décor (items #4, 5 *supra*). These pleadings are ample to put Defendants

14   on notice. Therefore, Claim 2 may proceed under both theories.

15                      ### iii.   *Claim 3 – NRS 598.0915(2), (5), (6), (7), (15)*

16        Plaintiffs' third claim is premised on false representations. They argue five separate

17   theories under NRS 598.0915, specifically that it is a deceptive trade practice to:

18   "**(2)** knowingly makes a false representation as to the source, sponsorship, approval,
19   or certification of goods or services for sale or lease. […]

20   **(5)** knowingly makes a false representation as to the characteristics, ingredients,
     uses, benefits, alterations, or quantities of goods or services for sale or lease or a
21   false representation as to the sponsorship, approval, status, affiliation or connection
22   of a person therewith.

23   **(6)** represents that goods for sale or lease are original or new if he or she knows or
     should know that they are deteriorated, altered, reconditioned, reclaimed, used or
24   secondhand.

25   **(7)** represents that goods or services for sale or lease are of a particular standard,
     quality or grade, or that such goods are of a particular style or model, if he or she
26   knows or should know that they are of another standard, quality, grade, style, or
27   model. […]

28   **(15)** knowingly makes any other false representation in an action.

1  Plaintiffs' allegations under this claim are limited to the items which were either unapproved,

2  damaged, or nonexistent, so far as they were represented to Plaintiffs to have certain characteristics

3  and meet certain specifications.

4      First, the Court finds that each of these five subsections sound in fraud. Each is premised

5  on allegations that Defendants explicitly misrepresented goods variously concerning those goods'

6  source, characteristics, condition, originality, and quality. Therefore, the heightened standard of

7  Rule 9(b) applies. Fed. R. Civ. P. 9(b).

8      Second, the Court turns to the sufficiency of Plaintiffs' allegations. Across the fifteen

9  specified items (items #1-15 *supra*), Plaintiffs provide details concerning an alleged deceptive

10 representation, how that delivered item differed, and damages incurred as a result. Defendants

11 argue such representations are analogous to "puffery" in advertising. Puffing, Black's Law

12 Dictionary (12th ed. 2024) ("The expression of an exaggerated opinion — as opposed to a factual

13 misrepresentation — with the intent to sell a good or service). The Court finds this is unavailing

14 for two reason. First, Defendants do not cite NDTPA cases. See Jgb Vegas Retail v. V Bleach

15 Bright, Case No. A-16-731898-C, 2017 Nev. Dist. LEXIS 2846 (Nev. 8th Jud. Dist. Ct. July 26,

16 2017) (referencing advertising puffery when looking for fraudulent inducement of a licensing

17 agreement);[5] Glen Holly Entm't, Inc. v. Tektronix Inc., 343 F.3d 1000, 1015 (9th Cir. 2003)

18 (applying California fraud and negligent misrepresentation law). They have not identified, nor has

19 this Court independently located, a "puffery" exception to the NDTPA. Second, puffery generally

20 "concerns expressions of opinion, as opposed to knowingly false statements of fact." Oregon Pub.

21 Emps. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 606 (9th Cir. 2014); see also Puffing, Black's

22 Law Dictionary (12th ed. 2024) (continuing that "Puffing involves expressing opinions, not

23 asserting something as a fact . . . . a seller may not misrepresent them or say that they have attributes

24 that they do not posses."). Plaintiffs allegations concern factual misrepresentations. The Court

25 finds that dimensions (items #1, 2, 4, 6, 8, 9, 10, 12, 14, 15 *supra*), condition (items #3, 5, 7, 13,

26 154 *supra*), material of construction (items #7, 14 *supra*), and color (items #1, 8, 11) are factual

27

28      [5] Defendants cite to "JGB Vegas Retail Lessee, LLC v. Bleach Bright of Las Vegas, LLC, No.16A731898, 2017 WL 3784517, at *2 (D. Nev. July 28, 2017)" – however, no such U.S. District of Nevada case exists. Their Westlaw citation leads to the above Nevada state decision.

propositions rather than matters of opinion.

Given the above, the Court finds that the §§ 5, 7, and 15 theories may proceed while the §§ 2 and 6 theories fail. The Court addresses each briefly. Section 2 requires a misrepresentation concerning "source, sponsorship, approval, or certification" and none of the allegations indicate a misrepresentation concerning, *e.g.*, the manufacturer of the goods. See Nev. Rev. Stat. § 598.0915(2). Thus, the § 2 theory is dismissed. Section 5 requires a misrepresentation concerning the "characteristics [or] alterations" of a good. Nev. Rev. Stat. § 598.0915(5). As alleged above, the characteristics of several items were misdescribed and several bespoke or altered items were not delivered as promised, so this theory proceeds. Section 6 relates to misrepresenting a "deteriorated, altered, reconditioned, reclaimed, used or second-hand" good as new. Nev. Rev. Stat. § 598.0915(6). No such allegation is made, and the § 6 theory fails. Next, § 7 concerns misrepresentations about a good's "quality or grade" or "style or model." Nev. Rev. Stat. § 598.0915(7). Multiple items are alleged to have inferior materials or workmanship or to have an altered style. Thus, the Court finds that the § 7 theory may proceed. Finally, § 15 provides "any other false representation" is a violation of the NDTPA. Nev. Rev. Stat. § 598.0915(15). The Court finds that Plaintiffs have sufficiently alleged other misrepresentations that may be fraudulent.

In sum, the Court finds that Claim 3 is sufficiently pleaded based on the §§ 5, 7, and 15 theories. See Fed. R. Civ. P. 8(d)(2) ("If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.").

### iv. *Claim 4 – NRS 598.0915(6), (9), (15)*

Claim 4 concern alleged deceptive advertising. Plaintiffs rely upon three theories under NRS 598.0915: §§ 6 and 15 above, as well as § 9, which defines knowingly advertising goods or services with intent not to sell or lease them as advertised as a deceptive trade practice. See Nev. Rev. Stat. §§ 598.0915(6), (9), (15).

First, for the same reasons as articulated for Claim 3, the Court finds that Rule 9(b) applies to all three sections. See Fed. R. Civ. P. 9(b).

Second, the Court finds Claim 4 is insufficiently pleaded. Claim 4 is premised on allegations that Defendants variously advertised goods or services to them with the intent to not

sell them as advertised. Specifically, Plaintiffs allege advertised goods were delivered late (items # **7**, 8, 9, 12 *supra*) (instance #2 *supra*), never delivered (items # 6 *supra*) (instance #2 *supra*) or switched out for an altered or different good (items # 1, 2, 4, 5, 7, 8, 9, 10, 11, 12, 13, 14, 15 *supra*).  The Court begins with § (9), which is the most immediately relevant. Section 9 provides that it is a deceptive trade practice to advertise goods or services with intent not to sell or lease them as advertised. Nev. Rev. Stat. § 598.0915(9). Within the NDTPA, "advertisement" is defined as "the attempt by publication, dissemination, solicitation, or circulation to induce, directly or indirectly, any person to enter into any obligation to lease or to acquire any title or interest in any property." Nev. Rev. Stat. 598.0905. Plaintiffs allege no such public advertising by Defendants. Rather, they simply attempt to relabel the same conduct complained of as misrepresentation in Claim 3 as advertising. Therefore, the § (9) theory fails. Next, the Court finds the § 6 theory also fails. Section 6 relates to misrepresenting a "deteriorated, altered, reconditioned, reclaimed, used or second-hand" good as new. Nev. Rev. Stat. § 598.0915(6). None of the alleged advertising relates to such goods. The Court also finds the § 15 theory fails as Claim 4 raises no "other false representation" beyond those complained of in Claim 3. Nev. Rev. Stat. § 598.0915(15). Therefore, Claim 4 will be dismissed as insufficiently pleaded.

### v.   *Claim 5 – NRS 598.0915(13), (14)*

The fifth claim revolves around allegations of fraudulent pricing practices. Plaintiffs argue two theories that provisions NRS 598.0915 apply here. First, § 13 makes it a deceptive trade practice to make false or misleading statements of fact concerning the price of goods or services for sale. Nev. Rev. Stat. § 598.0915(13). Second, § 14 similarly provides that fraudulently altering any contract, written statement of charges, or other document in connection with the sale of goods is a deceptive trade practice. Nev. Rev. Stat. § 598.0915(14).

First, the Court finds both sections are subject to the heightened pleading requirement of Rule 9(b) as both directly relate to false or misleading statements as well as fraudulently altered documents. See Fed. R. Civ. P. 9(b).

Second, the Court finds both theories are sufficiently pleaded. Plaintiffs allege that Defendants' failure to provide information or documentation identifying actual cost of goods and

services, including other fees and markups, violate both provisions (instances # 1-5 *supra*). For example, Defendants allegedly inflated or misrepresented the price of the office desk, floor lamp, table, end chairs, and kitchen table chairs (items #3, 6, 12, 14, 15). The Court finds the particularized allegations of unknown charges and upcharges to Plaintiffs' purchases, some of which are reflected in written documentation, may constitute both a misleading statement of fact concerning the price of goods and an alteration of a written statement of charges.

Therefore, Claim 5 will proceed under both theories.

### vi.   *Claim 6 – NRS 598.092(4), NRS 598.0923(1)(b)*

Finally, Claim 6 concern allegations of failed delivery and denials of refunds. Plaintiffs cite two theories of liability under NRS 598.091.[6] Section 4 makes it a deceptive trade practice to fail to make delivery of goods within a reasonable time or to fail to provide a refund where allowed. Nev. Rev. Stat. § 598.092(4). Section 1(b) makes it a deceptive trade practice to fail to disclose a material fact in connection with a sale of goods. Nev. Rev. Stat. §§ 598.0923(1)(b).

First, the Court finds that the heightened Rule 9(b) pleading standard applies to § 1(b) but not § 4. Section 1(b) requires a failure to disclose, which the Court has explained above sounds in fraud. However, § 4 is simply a failure to deliver goods or provide a refund—which does not sound in fraud. See Noonan v. Bayview Loan Servicing, LLC, 438 P.3d 335 (Nev. 2019) ("The suppression or omission of a material fact which a party is bound in good faith to disclose is equivalent to a false representation."); Fraud, Black's Law Dictionary (12th ed. 2024) ("[a] knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment.").

Second, the Court finds that Plaintiffs have sufficiently pleaded their sixth claim. Plaintiffs

---

[6] In the body of Claim 6, Plaintiffs make a passing reference to NRS 594.092(8) saying that "Holding Defendants' money hostage for a liability waiver is also a deceptive trade practice under NRS 594.092(8)." The Court understands Plaintiffs to holding *Plaintiffs'* money "hostage" is a violation of NRS § 598.092(8) (*n.b.*, NRS 594.092(8) does not exist). NRS 598.092(8) provides it is a deceptive trade practice to knowingly misrepresent the legal rights, obligations, or remedies of a party to a transaction. Even if the Court were to construe this passing reference as an alternative theory for Claim 6, it would not proceed. Plaintiffs briefly argue that Defendants violated the statute by refusing to return $69,000 in Plaintiffs' funds "on account" unless Plaintiffs provided a "release [of liability]." Nowhere in this alleged statement or elsewhere do Defendants misrepresent any legal rights, obligations, or remedies as part of a transaction.

premise their § 4 theory on Defendants' credit system (instance #3 *supra*) and failure to issue refunds for items not delivered after more than a year, *e.g.*, the floor lamp and table repair (items #4, 12 *supra*). Plaintiffs argue Defendants' failure to disclose to Plaintiffs' an estimated time in which a good would deliver constitutes a failure to disclose a material fact under § 1(b). The Court finds Plaintiff's allegations concerning their § 4 theory, which is not subject to Rule 9(b), are sufficient. They allege that goods were not delivered in a reasonable time and that refunds were not made. However, the Court finds that the § 1(b) theory is insufficiently pleaded. Plaintiffs make a conclusory allegation that "Defendants misrepresented or concealed that they were charging for, and promising to deliver, many items that could not be manufactured or obtained." The Court finds that no supporting factual allegations, much less any arising to the level of particularity required by Rule 9(b) are made.[7]

The Court finds that Plaintiffs sufficiently allege this claim under the § 4 theory for Claim 6 to proceed. See Fed. R. Civ. P. 8(d)(2) ("If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.").

### vii.   Rule 9(b) and Disaggregation

Defendants also make a general objection that all of Plaintiffs' claims that are subject to Rule 9(b) fail to state a claim because the FAC does not always distinguish between Ms. Adler, SAD, and their employees. Defendants are right that "Rule 9(b) does not allow a complaint to merely lump multiple defendants together[.]" Swartz, 476 F.3d at 764. However, "a complaint need not distinguish between defendants that had the exact same role in a fraud." United States ex rel. Silingo v. Wellpoint, Inc., 904 F.3d 667, 677 (9th Cir. 2018). The pleading must "at a minimum, 'identify the role of each defendant in the alleged fraudulent scheme.'" Swartz, 476 F.3d at 765 (cleaned up) (quoting Moore v. Kayport Package Express, Inc., 885 F.2d 531, 541 (9th Cir. 1989)). Indeed, the Ninth Circuit has been clear that there is "no absolute requirement that

---

[7] Indeed, Plaintiffs provide no citations in their Opposition. In its own review, the Court finds that the closest allegation is that Defendants at one point represented a pair of already ordered but substantially delayed sconces to be "in production" but later admitted the sconces were not going to be delivered. This does not establish that Defendants knew the scones was unavailable *at the time they made the transaction*. The same applies to other late objects. There are no allegations that Defendants knew these items would be delivered substantially late.

where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify false statements made by each and every defendant." Id. (emphasis removed). This comports with 9(b)'s goal that pleadings of fraud should "be specific enough to give defendants notice of the particular misconduct." Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009); see also Wright & Miller, 5A Federal Practice and Procedure § 1296 (4th ed.) (explaining the goals of Rule 9(b)).

The Court finds the FAC pleads with sufficient specificity for multiple reasons. First, as alleged Ms. Adler and SAD, her eponymous LLC, are tightly related actors. Second, the ample details concerning the circumstances of each instance of fraud are sufficient to put Defendants on notice. Third, Plaintiffs often identify specific documents, the author of which can easily be determined. Finally, in multiple places, the FAC provides the name of the employees the Maddoxes were interacting with.

### d.  Punitive Damages

Finally, Defendants ask the Court to strike Plaintiffs' request for punitive damages. They argue that the NDTPA does not provide for punitive damages except in circumstances not present in this case. See Nev. Rev. Stat. § 598.0977. Plaintiffs counter they are seeking punitive damages under NRS 42.005. The Nevada Supreme Court has explained "NRS 42.005 governs when punitive damages are authorized . . . . [i]n particular, subsection 1 authorizes punitive damages when 'it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice.'" D.R. Horton, Inc. v. Betsinger, 335 P.3d 1230, 1232 (Nev. 2014) (quoting Nev. Rev. Stat. § 42.005(1)). For NRS 42.005, fraud is defined as "an intentional misrepresentation, deception or concealment of a material fact known to the person with the intent to deprive another person of his or her rights or property or to otherwise injure another person." NRS 42.001(2). The Court finds the allegations as detailed above are sufficient to meet this definition of fraud. The Court thus finds that Plaintiffs may seek punitive damages for claims 2, 3, and 5. However, the request for punitive damages will be stricken from claims 1 and 6.

///

///

### e.  Leave to Amend

Leave to amend should not be granted where amendment would be futile. Carrico v. City & Cnty. of S.F., 656 F.3d 1002, 1008 (9th Cir. 2011). The Court finds that leave to amend the deficiencies outlined above would be futile. Further, the Court has previously provided Plaintiffs leave to amend the complaint. Therefore, the Court denies Plaintiffs leave to amend the FAC.

## V.      CONCLUSION

For the foregoing reasons, **IT IS ORDERED** the Motion to Dismiss (ECF No. 43) of Defendant Sasha Adler Design, LLC, and Sasha Adler is **GRANTED in part** as Claim 4 is **DISMISSED with prejudice** and the prayer for punitive damages for Claims 1 and 6 are **STRICKEN**. The motion is **DENIED in part** as regards Plaintiffs' other claims and prayer for punitive damages which may proceed consistent with this Order.

**IT IS FURTHER ORDERED** that the Plaintiffs Matthew Maddox and Katherine Maddox's Motion for Leave to File Excess Pages is **GRANTED**.

**DATED:** September 29, 2024.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**